IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | CV F 06 0870 OWW WMW |
| vs. | FINDINGS AND RECOMMENDATION |
| 2004 YUKON DENALI, LICENSE NUMBER 5YR294, VIN 1GKEK63U44J262979; APPROXIMATELY $27,820.00 IN U.S. CURRENCY; and APPROXIMATELY $37,100.00 IN U.S. CURRENCY | |
| Defendants. | |

This is a civil forfeiture action against defendant 2004 Yukon Denali, License Number 5YR294, VIN: 1GKEK63U44J262979 (defendant vehicle), approximately $27, 820.00 in U.S. Currency, and approximately $37,100.00 on U.S. Currency (defendant currency).

A Verified Complaint for Forfeiture *In Rem* was filed on July 10, 2006, seeking the forfeiture of the defendant vehicle and defendant currency, alleging that the vehicle is subject to forfeiture to the United States of America pursuant to 21 U.S.C. § 881(a)(4) because the defendant vehicle constitutes a conveyance used or intended to be used to transport, or in any manner to facilitate the transportation, sale, possession, or concealment of a controlled substance

in violation of 21 U.S.C. § 841 *et seq.*, and alleging that the currency is subject to forfeiture to the United States of America pursuant to 21 U.S.C. § 881(a)(6) because the defendant currency constitutes moneys or other things of value furnished or intended to be furnished in exchange for a controlled substance, all proceeds traceable to such an exchange and/or was used or intended to be used to facilitate one or more violations of 21 U.S.C. § 841 *et seq*.

On July 10, 2006, a Warrant for Arrest of defendant vehicle and defendant currency was issued and duly executed on July 18, 2006 and July 20, 2006, respectively. The Process Receipt and Returns were filed on August 1, 2006 and August 2, 2006.  Notice of the action against defendant vehicle and defendant currency appeared by publication on August 10, 17, 24 and 31, 2006, in the Inyo Register, a newspaper of general circulation in the county in which defendant vehicle and defendant currency were seized (Inyo County). The Proof of Publication was filed on October 30, 2006. Actual notice was personally served upon Nestor Amavica Obergon, Miguel Angel Ortega-Carrasco and Esteban Bravo Jimenez. Notice was served by certified mail to Bonilla Auto Sales. Additionally, attorney David R. Houston accepted service by certified mail on behalf of Nestor Amavica Obergon and attorney Scott N. Freeman accepted service by certified mail on behalf of Angel Ortega-Carrasco. Apart from claimants Nestor Amavica Obergon and Bonilla Auto Sales, no other parties have filed claims and answers in this matter, and the time for which any person or entity may file a claim and answer has expired.  The Unites States' allegations are set forth in its Verified Complaint for Forfeiture *In Rem* filed July 10, 2006. The allegations follow.

> 5. On or about January 11, 2006, Esteban Bravo Jimenez (hereinafter "Jimenez"), Nestor Amavica Obergon (hereinafter "Obergon"), and Miguel Angel Ortega-Carrasco (hereinafter "Ortega-Carrasco") were traveling northbound on Highway 395, in Bishop, California in a 2004 Yukon Denali. The defendant vehicle was stopped by a California Highway Patrol ("CHP") officer for no vehicle license plates and dark tinted windows, violations of California Vehicle Code §§ 26708 and 5200.

6. The CHP officer approached the vehicle and contacted the occupants through the front passenger-side window. The officer told the driver the reason for the traffic stop. The officer asked the driver for his driver's license, vehicle registration, and proof of insurance. The driver stated, "I don't have a license," at which time the passenger sitting in the rear seat of the vehicle (Ortega-Carrasco) interrupted that the vehicle belonged to him. Ortega-Carrasco handed the officer a Nevada State driver's license stating that he had recently purchased the vehicle and was living in Nevada. The officer noted Ortega-Carrasco's hands were shaking. Ortega-Carrasco further stated to the officer that he knew the driver was unlicensed but he was too tired to drive. The officer asked the right front passenger (Obergon) to give him the dealer sticker from the windshield. Obergon nervously handed the officer the dealer sticker which evidenced that the vehicle was purchased on January 3, 2005, one year earlier. Obergon's hands were shaking.

7. While at the vehicle, the officer noted there was no visible luggage, Obergon looked straight ahead in his seat while the officer was questioning the other occupants, there was a strong odor of cologne coming from within the vehicle, a blanket was on the rear seat, a map in the center console area, there were only vehicle keys on the key chain in the ignition, an energy drink in the cup holder, and a cellular phone and a bottle of cologne both in the center console.

8. The officer asked Jimenez, the driver of the vehicle, to step from the vehicle. The officer spoke with Jimenez at the right front of the officer's patrol vehicle. Jimenez produced a South Carolina Identification Card evidencing his identity. The officer ran a driver's license check through the CHP office and while waiting for the results of the check, spoke with Jimenez. When the officer asked where he and the other passengers were traveling, Jimenez stated that they were going to the Hawaiian Gardens to visit with relatives for the day and that they were all going to return to Reno together. Jimenez stated that he did not know who the right front passenger (Obergon) was because they had just met. Jimenez further stated that Ortega-Carrasco was his neighbor of two years and that his name was Miguel but could not remember Miguel's last name. Jimenez represented to the officer that he was born in Mexico and moved to the United States in 1990 and that he had only been living in Reno, Nevada for one year. The officer asked Jimenez if there was any luggage in the vehicle and Jimenez replied that he did not have any luggage because this was just a day trip and he had to be at work the next day at 7:00 a.m. When asked about his driver's license, Jimenez stated that he had never bothered to apply for one. When asked about the vehicle, Jimenez stated that Ortega-Carrasco had just purchased the vehicle and there were some issues with the title of the vehicle that Ortega-

3

Carrasco said he was going to take care of while in Hawaiian Gardens.

9. At this time, another CHP unit stopped to assist. While speaking with Jimenez, the questioning officer observed that Jimenez continually looked in the direction of the vehicle, he repeated the questions back to the officer, and his statement was not internally consistent. When asked if there were narcotics, large amounts of money, or anything illegal in the vehicle, Jimenez stated, "No." A search of Jimenez' person revealed a small amount of marijuana in a baggie inside Jimenez' wallet. CHP reported that Jimenez was unlicensed and his California driver's license was suspended. The officer asked Jimenez to stand by the assisting officer's patrol vehicle while he questioned Ortega-Carrasco.

10. The officer then asked Ortega-Carrasco, the backseat passenger of the vehicle, to step out of the vehicle. When asked about the driver, Ortega-Carrasco informed the officer that he knew the driver as Esteban (Jimenez) and the two have been neighbors for five to seven years, however, he did not know Esteban's last name.

11. The officer was informed by Ortega-Carrasco that he, Esteban, and Obergon were driving to the San Bernardino area to purchase vehicles at a car auction. The officer was further informed by Ortega-Carrasco that Obergon was his friend's son and he had known him for 10 to 12 years. Ortega-Carrasco was hesitant in giving the officer Obergon's name but stated, "Nestor." Ortega-Carrasco could not remember Nestor's or Nestor's father's name but knew his nickname, "Cici." Ortega-Carrasco stated that he, Esteban, and Nestor were going to be down south for two days and then they would drive back with the new cars to Reno. Ortega-Carrasco stated that he had recently purchased the Yukon Denali and that the Bill of Sale was located on the driver's side of the vehicle. The officer asked why they were not carrying any luggage and Ortega-Carrasco replied that they were all going to wear the same clothes for two days. The officer asked if there was anything illegal in the vehicle and Ortega-Carrasco answered, "Not that I know of." The officer then asked if there were narcotics or large amounts of money in the vehicle and Ortega-Carrasco informed the officer that there was $20,000.00 in a black case behind the driver's seat and that the money was for purchasing cars at the auction. Ortega-Carrasco stated that he worked as an AV Tech at the Legacy and the Sienna Casino for $15.00 per hour. The officer asked if he had earned the $20,000.00 through working and he stated that he did. Ortega-Carrasco stated that he deposited his checks into a banking institution but did not withdraw the money he had with him from the bank. Ortega Carrasco stated that he withdrew only a small amount of the money from the bank and the rest he simply "had." Ortega-Carrasco could not explain to the

officer where he kept the money or why it was not deposited in a bank. Ortega-Carrasco did not know if there were any other large amounts of money in the vehicle. The officer asked Ortega-Carrasco where he kept the cash if he did not keep it in a bank. Ortega-Carrasco did not give a specific location as to where he kept the money, he stated that he simply "had" the money. Ortega-Carrasco stated the he had about $1,000.00 in his bank account. When asked if there were any other large amounts of money in the vehicle, Ortega-Carrasco said not that he knew of. When asked if he had been arrested before, Ortega-Carrasco stated that he had been arrested for possession of cocaine for sale 13 years ago. Ortega-Carrasco related that he paid $10,000.00 for the Yukon Denali. Ortega-Carrasco's driver's license check returned a valid Nevada driver's license.

12. During questioning, the officer observed that Ortega-Carrasco repeatedly looked over to the vehicle, his statement did not make sense and it conflicted with the driver's statement, he appeared extremely nervous, and he could not explain where the cash came from. The officer searched Ortega-Carrasco and found no weapons. The officer asked Ortega-Carrasco to sit in his patrol vehicle while he spoke with Obergon and Ortega-Carrasco complied.

13. The right-front passenger, Obergon, appeared very jumpy upon the officer's approach. A California driver's license identified the right-front passenger as Nestor Obergon. When asked about the identity of the driver, Obergon stuttered and could not speak. When asked a second time about the identity of the driver, Obergon repeated the question to the officer. Obergon then stated that he did not know the driver as he had only met him a few times. Obergon said that he has known the rear passenger all his life because he was Obergon's father's friend. Obergon knew the rear passenger as Miguel but could not remember Miguel's last name. When asked about where he was going, Obergon stated the purpose of their trip was to purchase a car in San Bernardino and that he, Esteban, and Miguel would be there for a few days. The officer asked if they would be staying for a week and Obergon replied, "No, only four days." When asked why they did not carry any luggage for such a trip, Obergon stated that he had a sister in Riverside and he could change clothes there. Obergon stated that all three of them would be traveling back to Reno together. When asked if there were narcotics, large amounts of money, or anything illegal in the vehicle, Obergon looked at the dashboard, began to breathe rapidly, and replied nervously, "Well, yeah, I got, ah, like $36,000.00 in the back, to buy a car." At this time, the officer requested a CHP supervisor's assistance so the officer could check the VIN and registration of the vehicle and further question the subjects.

14. When asked about the possession of such a large amount of cash, Obergon explained that he operated excavating equipment but that he was currently working in a mill earning $19.00 per hour. When asked what kind of mill Obergon answered, "You know the kind that makes 2x4's and stuff." Obergon explained that he borrowed $20,000.00 from his mother because she had come into some money. The officer asked where the rest of the money came from and Obergon stated he got it from his mother. The officer stated, "I thought you borrowed $20,000.00 from your mom." Obergon hesitated. The officer asked again where the rest of the money came from. Obergon stated he received it from his mother that morning. When asked whether he received $36,000.00 or $20,000.00 from his mother, Obergon stated the borrowed $20,000.00 from his mother and the other $16,000.00 was money that he "left" at his mother's house. Obergon stated he normally puts his money in a bank account but that none of the $36,000.00 had been in the bank. Obergon stated that he had about $10,000.00 in the bank at present. Obergon explained that his parents recently sold some property and the sale proceeds was where the money came from. Obergon stated that he had been arrested for possession of narcotics in the past. During questioning, the officer observed that Obergon appeared very nervous. Obergon was searched for weapons. No weapons were found.

15. The CHP officer then requested a criminal history check on all three subjects. The criminal history confirmed that Obergon and Ortega-Carrasco had been arrested for possession of controlled substances and for prior weapons violations.

16. The CHP officer obtained the VIN number and conducted a registration check on the vehicle. The vehicle was purchased from Southern California Auto Auction Company with a VIN number from the State of Nevada. While running the VIN and registration check on the vehicle, the officer found a Transfer of Ownership document on the vehicle. The document evidenced that the vehicle had been purchased on January 3, 2006, just eight (8) days before, for $26,000.00 and not $10,000.00 as Ortega-Carrasco previously stated.

17. The officer walked over to his patrol vehicle where Ortega-Carrasco was seated inside and asked him again about the cash. Ortega-Carrasco could not give a specific location as to where the cash came from and stated that he "had" the money.

18. Two CHP officers then conducted a probable cause search of the vehicle and found a large amount in U.S. Currency wrapped in multiple small bundles in a grocery bag wrapped in a black bag totaling approximately $37,100.00 located under the left middle rear seat; several more bundles in U.S. Currency wrapped in plastic wrap (except for one bundle which was not wrapped in

plastic wrap) totaling approximately $27,820.00 located in a black case found underneath the center rear seat; and, a loaded .380 caliber 9mm AMT handgun with a .380 caliber Magazine found between both packages of money. The firearm was located within the reach of either Ortega-Carrasco or Obergon. Five .380 caliber rounds, three cellular phones, and a lap-top computer were also found in the vehicle. The approximately $27,820.00 in U.S. Currency was found in denominations of 191 x $20.00 and 240 x $100.00. The approximately $37,100.00 in U.S. Currency was found in denominations of 2 x $5.00; 2 x $10.00; 720 x $20.00; 3 x $50.00; 225 x $100.00.

19. On January 11, 2006, Jimenez was arrested for violation of Vehicle Code § 12500(a) - Unlicensed Driver and was subsequently released after being booked at the Inyo County Jail. Ortega-Carrasco and Obergon were both arrested for violations of Penal Code §§§ 12021(a)(1), 12025(a)(1), and 12031(a)(1) - Felon in Possession of a Firearm, Carrying a Concealed Weapon, and Possession of Loaded Firearm in Public.

20. At the Bishop California Highway Patrol Office, a K-9 alerted to the dashboard of the vehicle and alerted to the driver's side middle seat. A small amount of marijuana was found in an amber prescription bottle found within the dashboard. The K-9 also separately alerted to both quantities of money found in the vehicle.

21. A clandestine recording of Ortega-Carrasco and Obergon's cell phone conversations while seated in the officer's patrol vehicle confirmed the presence of a firearm in the vehicle and the location of narcotics at a storage facility in Reno, Nevada. The Drug Enforcement Administration executed a search warrant and seized five (5) grams of methamphetamine from the storage facility. Law enforcement believes that the bulk of the contraband was removed before the search warrant could be executed.

22. On March 31, 2006, Ortega-Carrasco pled guilty to one count of felony violation of California Penal Code § 12025(a)(1) - Carrying Concealed Weapon Within a Vehicle. Ortega-Carrasco was sentenced on May 4, 2006 to serve 16 months in custody.

23. On March 31, 2006, Obergon pled guilty to one count of felony violation of California Penal Code § 12025(a)(1) - Carrying Concealed Weapon Within a Vehicle. Obergon was sentenced on May 4, 2006 to serve 16 months in custody.

(Compl., ¶¶ 5-23).

To avoid the uncertainty and expense of further litigation, the United States and Claimant Nestor Amavica Obergon desire to settle this forfeiture action as to Nestor Amavica Obergon's interest in the defendant assets. To that end, the United States and Claimant Nestor Amavica Obergon have stipulated and agreed to settle this forfeiture action as to Nestor Amavica Obergon. In accordance with the agreement, IT IS HEREBY RECOMMENDED that:

1. Upon entry of a Final Judgment of Forfeiture, the 2004 Yukon Denali, License Number 5YR294, VIN 1GKEK63U44J262979, approximately $27, 820.00 in U.S. Currency, and $35,000.00 of the defendant approximately $37,100.00 in U.S. Currency, together with any interest that may have accrued on that amount, seized on or about January 11, 2006, shall be forfeited to the United States pursuant to 21 U.S.C. § 881(a)(4) and 881(a)(6), to be disposed of according to law.

2. Upon entry of a Final Judgment of Forfeiture herein, but no later than 45 days thereafter, $2,100.00 of the approximately $37,100.00 in U.S. Currency, together with any interest that may have accrued on that amount, shall be returned to Claimant Nestor Amavica Obergon through his attorney David R. Houston at 432 Court Street, Reno, NV 89501.

3. Claimant Nestor Amavica Obergon hereby is acknowledged as the sole owner of the defendant approximately $37,100.00 in U.S. Currency and that no other person or entity has any legitimate claim of interest therein. Should any person or entity institute any kind of claim or action against the government with regard to its forfeiture of the $35,000.00 of the defendant approximately $37,000.00 in U.S. Currency, Nestor Amavica Obergon shall hold harmless and indemnify the United States, as set forth below.

4. Plaintiff United States of America and its servants, agents, and employees, and all other public entities, their servants, agents, and employees are released by Claimant Nestor Amavica Obergon from any and all liability arising out of or in any way connected with the arrest, seizure, or forfeiture of the 2004 Yukon Denali, License Number 5YR294, VIN

1    1GKEK63U44J262979, approximately $27, 820.00 in U.S. Currency, and approximately

2    $37,100.00 in U.S. Currency seized on or about January 11, 2006. This is a full and final release

3    applying to all unknown and anticipated injuries, and/or damages arising out of said arrest,

4    seizure or forfeiture, as well as to those now known or disclosed. The provisions of California

5    Civil Code § 1542, are waived. This provision provides: "A general release does not extend to

6    claims which the creditor does not know or suspect to exist in his favor at the time of executing

7    the release, which if known by him must have materially affected his settlement with the debtor."

8           5. All claim or right to interest that may have accrued on the $35,000.00 of the defendant

9    approximately $37,100.00 in U.S. Currency, or any portion thereof, seized on or about January

10   11, 2006 is waived by Nestor Amavica Obergon.

11          6. Without an admission that the defendant currency constitutes moneys or other things

12   of value furnished or intended to be furnished in exchange for a controlled substance, or that the

13   defendant vehicle was used or intended to be furnished in exchange for a controlled substance, or

14   that the defendant vehicle was used or intended to be used to transport, or in any manner to

15   facilitate the transportation, sale, possession, or concealment or a controlled substance, Claimant

16   Nestor Amavica Obergon stipulates that there was reasonable cause for the seizure and arrest of

17   the 2004 Yukon Denali, License Number 5YR294, VIN 1GKEK63U44J262979, approximately

18   $27, 8720.00 in U.S. Currency, and approximately $37,100.00 in U.S. Currency and that the

19   Court may enter a Certificate of Reasonable Cause pursuant to 28 U.S.C. § 2465.

20          These findings and recommendations are submitted to the United States District Judge

21   assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within fifteen

22   days after being served with these findings and recommendations, any party may file written

23   objections with the court and serve a copy on all parties. Such a document should be captioned

24   "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections

25   shall be served and filed within ten days after service of the objections. Failure to file

26

1  objections within the specified time may waive the right to appeal the District Court's order.
2  Martinez v. Ylst, 951 F.2d 1153 (9 Cir. 991).
3  IT IS SO ORDERED.
4  **Dated:   October 15, 2007**          /s/  **William M. Wunderlich**
                                          UNITED STATES MAGISTRATE JUDGE